1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   CHANEL EPPS,                ) Civil No. 09-1380-WQH(WVG)
                                 )
12                   Plaintiff,  ) REPORT AND RECOMMENDATION
                                 ) DENYING PLAINTIFF'S MOTION
13   v.                          ) FOR SUMMARY JUDGMENT AND
                                 ) GRANTING DEFENDANT'S MOTION
14   MICHAEL J. ASTRUE, Commissioner ) FOR SUMMARY JUDGMENT
     of Social Security,         )
15                               )
                     Defendant.  ) (Doc. Nos. 16, 22)
16                               )
     _____ )
17

18        Plaintiff Chanel Epps (hereafter "Plaintiff"), filed a

19   Complaint For Judicial Review And Remedy On Administrative Decision

20   Under The Social Security Act [42 U.S.C. §405(g)].   Defendant

21   Michael J. Astrue (hereafter "Defendant"), filed an Answer to the

22   Complaint and the administrative record (hereafter "Tr."), pertain-

23   ing to this case. Plaintiff has filed a Motion for Summary Judgment.

24   Defendant has filed an Opposition to Plaintiff's Motion for Summary

25   Judgment and a Cross-Motion for Summary Judgment.

26        The Court, having reviewed Plaintiff's Motion for Summary

27   Judgment, Defendant's Opposition to Plaintiff's Motion for Summary

28   Judgment, Defendant's Cross-Motion for Summary Judgment and the

09cv1380

1  administrative record filed by Defendant, hereby finds that

2  Plaintiff is not entitled to the relief requested and therefore

3  RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED

4  and Defendant's Motion for Summary Judgment be GRANTED.

5  I

6  PROCEDURAL HISTORY

7  On May 15, 2006, Plaintiff filed applications for Supplemen-

8  tal Security Income benefits and Disability Insurance Benefits,

9  alleging that she was disabled since December 15, 2005. (Tr. 50-51,

10  122, 124-128, 129-132). The Commissioner of Social Security denied

11  her application initially and upon reconsideration. (Tr. 70-74, 77-

12  82). On February 18, 2009, a hearing was held at which Plaintiff

13  appeared with counsel and testified before an Administrative Law

14  Judge (hereafter "ALJ") (Tr. 22-54).  On March 17, 2009, the ALJ

15  found that Plaintiff was not disabled. (Tr. 9-21). The ALJ's

16  decision became the final decision of the Commissioner of Social

17  Security when the Appeals Council denied Plaintiff's request for

18  review. (Tr. 1-3).

19  II

20  SUMMARY OF APPLICABLE LAW

21  Title II of the Social Security Act (hereinafter "Act"), as

22  amended, provides for the payment of insurance benefits to persons

23  who have contributed to the program and who suffer from a physical

24  or mental disability.  42 U.S.C. § 423 (a)(1)(D). Title XVI of the

25  Act provides for the payment of disability benefits to indigent

26  persons under the Supplemental Security Income (SSI) program. § 1382

27  (a).  Both titles of the Act define "disability" as the "inability

28  to engage in any substantial gainful activity by reason of any

09cv1380

medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months...” Id.  The Act further provides that an individual:

> shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. Id.

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920. Step one determines whether the claimant is engaged in “substantial gainful activity.”  If he is, disability benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. That determination is governed by the “severity regulation” at issue in this case.  The severity regulation provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience. §§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as “the abilities and aptitudes necessary to do most jobs.” 20 C.F.R. §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include “[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;” “[c]apacities

09cv1380

for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" [u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting." Id.

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his previous work, the fifth and final step of the process determines whether he is able to perform other work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

09cv1380

III

ALJ'S FINDINGS

The ALJ made the following pertinent findings:

1. (Plaintiff) met the insured status requirements of the Social Security Act through June 30, 2007.

2. (Plaintiff) has not engaged in substantial gainful activity since December 15, 2005, the alleged onset date.

3. (Plaintiff) has the following severe combination of impairments: post-traumatic stress disorder, depressive disorder, personality disorder, attention-deficit hyperactivity disorder, learning disorder by history, obesity associated with low back pain, bilateral chondromalacia patella, status-post arthroscopic chondroplasty to both knees with improvement post-operatively.  She also has a history of marijuana and alcohol abuse in remission.

The impairments considered in combination, have more than a minimal effect on (Plaintiff's) ability to perform basic work activities.

Based upon his thorough review of the record, Dr. Weilepp (a board-certified orthopedist) testified regarding the medically determinable impairments established in the record.  Dr. Weilepp considered (Plaintiff's) history of right-sided knee symptoms in July 2004, which were precipitated by dancing and preceded the December 15, 2005 non-traumatic onset date.  He then stated she had two procedures to her knees, one on June 15, 2006 for the left knee, and another on November 11, 2008 for the right knee.  He specifically noted that there were no meniscus injuries or ligament injuries.  Rather, the surgeries were for soft-tissue, synovial-type problems with possible cystic-type problems. He explained that the problems were not inconsistent with patellar problems and chronic instability issues but that the problems were not well defined by the objective evidence in the record.  He acknowledged she had used a cane and a walker for a period of time post-operatively, but he stressed that she had recovered normally from the procedures without any complications, such as infections, or re-injuries.  Dr. Weilepp also referred to magnetic resonance imaging of both knees that showed significant patellar changes, and he commented that such changes were not unusual for people who are obese and not particularly athletic.  He also emphasized that weight is a major issue with management of knee problems, noting that (Plaintiff's) body mass index of 46.26 is abnormal and severe.  He further noted that

5

09cv1380

chondromalacia of both knees is not uncommon, but he could find no specific mention of surgical correction for tracking in her knees. In sum, Dr. Weilepp concluded that (Plaintiff's) knee problems had maximally improved with the procedures, save an improvement in her weight, and he recommended avoid-ance of aggravating activities such as crawling, walking on irregular terrain, or activities involving heights or ladders.

According to Dr. Weilepp, the reported back problem appeared to be related to a mechanical problem, as it was not complemented by any x-rays, had been treated conservatively, and was a known common problem in individuals with obesity.

As for the severity of (Plaintiff's) impairments, Dr. Weilepp opined that (Plaintiff's) conditions do not meet or equal the severity of a listing. He stressed that (Plaintiff's) knee problems had improved with surgical care without complications and there had been a return to activity. In Dr. Weilepp's opinion, (Plaintiff) is capable of lifting twenty pounds frequently and forty pounds occasionally and has no impairment cumulatively in her capacity for standing, walking or sitting. However, he concluded (Plaintiff) should not work at heights, on ladders, or around dangerous equipment, and he recommended she avoid walking on irregular terrain or going up and over low blocks or curbs. He further opined she should not engage in frequent kneeling, crawling or squatting. Nor can she engage in heavy industrial driving.

The undersigned finds Dr. Weilepp's testimony persua-sive and supported by evidence of record when consid-ered as a whole.

In particular, orthopedist Dr. David Flood's treatment records do establish that he diagnosed and treated (Plaintiff) for bilateral knee problems.

Likewise, the handwritten progress noted of her primary care physician Dr. Bryan Abramowitz, reflect that he rendered conservative treatment and followed her for diagnoses of back pain presumed secondary to obesity, knee pain related to chondromalacia, head-aches, and grief reaction/depression/insomnia. It is significant to note the migraines were responsive to medication. He also advised to lose weight to address the knee pain.

Despite her severe knee problems, it is significant to note that on physical examination in December 2006, when she began treating for emotional problems, she had normal muscle strength and normal gait and station. Likewise, in April 2007, when she was being

09cv1380

evaluated for her emotional problems, her gait and posture were observed as normal.

In addition to the treatment records, the record contains two consultive examination reports prepared at the request of the State Agency. In August 2006, Sandra Eriks, M.D., a board-certified internist, examined (Plaintiff), but her findings were essentially normal. Despite (Plaintiff's) history of knee and back pain, Dr. Eriks concluded (Plaintiff) had no physical limitations.

Similarly, after performing a second consultative examination in April 2007, Dr. Eriks again concluded (Plaintiff) has no physical limitations.

In addition, the non-examining medical consultants for the State Agency, S.C. Swan, M.D., a general practitioner, and Diane Rose, M.D., an internist, agreed with Dr. Eriks that (Plaintiff) had no severe physical limitations.

It is significant to note that there is no treating physician opinion to the contrary.

From a mental standpoint, (Plaintiff) has a history of attention-deficit hyperactivity disorder diagnosed in November 2003 by Amy Ellis, Psy. D. However, it is significant to note (Plaintiff) graduated high school with a "C" average despite her attention problems and was only diagnosed after she referred herself for evaluation.

The records reflect that her primary care physician began prescribing psychiatric medications in mid-2006 for treatment of grief reaction/depression/insomnia, but did not receive care from a mental health care professional at that time.

(Plaintiff's) depression worsened in December 2006, apparently exacerbated by the death of her best friend in December 2006 due to gunshot wound, which followed shortly after the death of her sister in June 2006 due to illness. (Ex. 19F/4) She was seen in the emergency room on December 10, 2006 for a mixed-drug overdose, primary drug Benadryl, depression with suicidal ideation, and acute situational disturbance. However, she denied previous psychiatric history or treatment except for Effexor, Ativan and Ambien prescribed by her primary care physician. She was diagnosed with major depressive disorder, single episode, and anxiety disorder NOS. She was transferred to Mercy Behavioral Health in stable condition with plans for a 72-hour hold. However, after evaluation by the staff at Mercy, the hold was discontinued. On mental status examination on December 11, 2006, (Plaintiff) was in

09cv1380

no acute distress. Her mood was moderately depressed, and her affect was blunted. Speech was spontaneous and coherent, thoughts were organized, and associations were tight. (Plaintiff's) attention, concentration and memory were intact. (Plaintiff) was discharged home in stable condition with an increased dose of Effexor to 300 milligrams.

Mental Health records from South Bay Guidance Center reflect (Plaintiff) initially presented for treatment in mid 2007 and had a positive response to prescribed treatment, including psychiatric medications and counseling. On psychiatric evaluation in July 2007, mental status examination was remarkable only for anxious mood. (Plaintiff) had normal orientation, clear and goal directed speech, normal primary mental abilities, good attention, linear thought process and good insight. (Ex. 19F/2). (Plaintiff) admitted to a history of marijuana abuse and alcohol abuse. (Ex. 19F/2). She was diagnosed with a major depressive disorder, post-traumatic stress disorder, personality disorder, and alcohol and marijuana dependence in full, sustained remission. (Ex. 19F).

Although (Plaintiff) had occasional positive findings on mental status examination, her reported symptoms were usually related to noncompliance with prescribed treatment. For example, on follow-up in October 2007, (Plaintiff's) mood was only so-so and her affect was constricted, but she had been only partially compliant with prescribed medication. (Ex. 19F/25). Similarly, on follow-up (i)n May 2008, her mood was awful and her affect restricted, but she had stopped taking her prescribed antidepressant Effexor. (Ex. 19F/18). By contrast, when she was compliant with prescribed medication, she had essentially normal mental status examinations on follow-up in August 2007, January 2008, March 2008, April 2008, June 2008, and August 2008. (Exs. 19F/16, 17, 20, 21, 24). She failed to show for her regularly scheduled monthly appointments from September 2008 (through) November 2008. (Exs. 19F/11, 12, 13, 15, 16), but her symptoms appear to have remained under control, as there is no evidence to the contrary.

The record also contains two reports from two examining psychological consultants for the State Agency. On psychological evaluation in August 2006 with C. Valette, Ph.D., (Plaintiff) had no history of psychiatric hospitalization. Her medications included Effexor and Ambien and her mental status examination was essentially within normal limits. Dr. Valette opined that the psychiatric medications appeared to be working well. Based on the results of test scores, interaction with (Plaintiff), and background information, Dr. Valette diagnosed a history of

09cv1380

learning disorder with estimated intellectual func-
tioning in the average range. However, Dr. Valette
found no signs or symptoms of depression. Nor did
(Plaintiff) relay any symptoms upon which Dr. Valette
could diagnose post-traumatic stress disorder.
Overall, Dr. Valette found (Plaintiff) under no
mental restrictions.

At a second consultive examination in April 2007,
Mounir Soliman, M.D., a psychiatrist, diagnosed major
depression, mild to moderate, and an attention-
deficit hyperactivity disorder. Mental status
examination findings were significant for depressed
mood, congruent affect, and decreased energy, but
(Plaintiff) denied suicidal or homicidal ideation.
Intellectual functioning and sensorium were grossly
intact with no demonstrated deficits in concentration
or memory demonstrated on formal testing. Overall,
Dr. Soliman concluded (Plaintiff) could understand,
remember, and carry out simple and complex instruc-
tion, interact with coworkers, supervisors, and the
public, and withstand the stress and pressures
associated with day-to-day work activities.

In addition, the non-examining medical consultants
for the State Agency, E. P. O'Malley, Ph.D., and K.
Loomis, M.D., concluded (Plaintiff) had no severe
mental impairment.

4. (Plaintiff) does not have an impairment or combi-
nation of impairments that meets or medically equals
one of the listed impairments in 20 CFR Part 404,
Subpart P, Appendix 1.

(Plaintiff) had the following degree of limitation in
the broad areas of functioning set out in the dis-
ability regulations for evaluating mental disorders
and in the mental disorders listings in 20 CFR Part
404, Subpart P, Appendix 1: no restriction in activi-
ties of daily living, mild difficulties in maintain-
ing social functioning, moderate difficulties in
maintaining concentration, persistence or pace, and
no episodes of decompensation.

5. After careful consideration of the entire record,
the undersigned finds that (Plaintiff) has the
residual functional capacity to perform light work,
as (that) term is defined in 20 CFR 404.1567(b) and
416.967(b), except that (Plaintiff) may not work on
uneven terrain, at unprotected heights, or near
dangerous moving machinery; may not drive industrial
machinery; has occasional postural limitations; is
precluded from frequent squatting or crawling; and is
limited to unskilled, low stress work involving
limited public contact.

09cv1380

(Plaintiff) alleged a disability commencing December 15, 2005, due to post-traumatic stress disorder, depression, problems with both knees, and a back problem. She alleged that she stopped working because it involved too much standing. She later added that she was disabled due to depression, back pain, attention-deficit hyperactivity disorder, and migraines.

After careful consideration of the evidence, the undersigned finds that (Plaintiff's) medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, (Plaintiff's) statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

While the undersigned is sympathetic with the difficulties that (Plaintiff) is experiencing, they do not support a conclusion of "disability" under the Act. The undersigned has considered (Plaintiff's) allegations of pain, excess pain, and limitations pursuant to the law of the Ninth Circuit Court of Appeals, Social Security Ruling 96-7p and the pertinent regulations. However, (Plaintiff's) allegations of disability are not credible to the extent alleged.

For the reasons set forth below, the undersigned rejects (Plaintiff's) allegations of disability to the extent alleged. First, no objective findings support (Plaintiff's) allegations of limitations to the extent alleged. There is no radiographic evidence of lumbar spine impairment, despite complaints of low back pain. Second, (Plaintiff) does not require any assistive devices when walking, despite her claims of disabling back and knee pain. Third, though (Plaintiff) alleged memory and concentration difficulties, she demonstrated no memory or concentration deficits upon repeated mental status examinations. (Exs. 19F). Fourth, even though (Plaintiff) alleges disabling back and knee pain, she does not exhibit any atrophy. In fact, she reported to Dr. Eriks that medication relieved her pain. Fifth, with the exception of left knee arthroscopic surgery in June 2006 and right knee arthroscopic surgery in November 2008 with apparent satisfactory recoveries, (Plaintiff's) course of treatment has reflected a conservative approach. Sixth, the record does not indicate that (Plaintiff) suffers from debilitating side effects of her medications. Though she occasionally complained of side effects from her psychiatric medications, adjustments were made to her medication regimen to address those complaints. (Ex. 19F). Seventh, although (Plaintiff) alleges disabling psychiatric symptoms, her symptoms appear to be adequately

09cv1380

controlled with prescribed treatment. (Ex. 19F). Eighth, the severely restricted activities (Plaintiff) testified to at the hearing appear to be self-limited and not commensurate with the severity of her medically determinable impairments.  She indicated she could prepare simple meals and do laundry.  She testified that she had been taking a full course load at a community college but had dropped out of several classes and was taking only two courses on Tuesdays and Thursdays. She was also receiving counseling at South Bay Guidance Center.  By contrast, in August 2006, (Plaintiff) described relatively full activities of daily living, including being a full-time student, living in her parents' home, and doing much of the cooking, cleaning and shopping.  Likewise, in April 2007, she related that she was able to cook, clean, shop, run errands, take care of personal hygiene, and care for financial responsibilities. She also reported getting along well with family, friends and neighbors.  She stated that she got around by walking or taking the bus and did not require as assistive device for ambulation. Ninth, Dr. Weilepp, a board-certified orthopedist, imposed physical limitations consistent with the performance of sustained light work activity, and no treating source has imposed specific functional limitations inconsistent (with) these limitations. Tenth, despite her history of attention-deficit hyperactivity disorder, she graduated high school with a "C" average. Eleventh, despite a history of asthma, there were no abnormalities on x-ray and no hospitalizations for exacerbations of the disease. Twelfth, her headaches are adequately controlled with prescribed medication. Consequently, (Plaintiff's) allegations are not considered credible to the extent alleged.

As for the opinion evidence, the undersigned has afforded the greatest weight to the opinion of Dr. George Weilepp, as he is an orthopedic specialist, and his functional assessment is uncontroverted by any medical source. Dr. Weilepp has considered (Plaintiff's) severe orthopedic problems as well as her severe obesity in arriving at his functional assessment. (Plaintiff's) obesity, though severe, allows for the performance of sustained work activity within the above-adopted residual functional capacity.  It is significant to note that the remaining assessments from the examining and non-examining medical consultants are even less restrictive and allow for the performance of sustained light work activity.

From a mental perspective, the assessments of the examining and non-examining medical consultants allow for the performance of at least unskilled work. Having considered (Plaintiff's) diagnosed personality

11

09cv1380

disorder, the undersigned added a limitation to non-public work, despite her admission that she gets along well with family, friends, and neighbors. Similarly, (Plaintiff's) history of attention-deficit hyperactivity disorder has been accounted for in the limitation to unskilled work, despite (Plaintiff's) admission that she graduated high school and is now attending community college. It is also important to note that no treating source has imposed any specific mental functioning limitation to the contrary.

6. (Plaintiff) is unable to perform any past relevant work.

The vocational expert classified past relevant work as follows: a bagger, an unskilled medium occupation; a children's attendant, an unskilled, light occupation; a fast foods worker, an unskilled light occupation; a sales attendant, an unskilled, light occupation and a cashier II, an unskilled, light occupation. When asked to consider a hypothetical individual with the above-adopted residual functional capacity, the vocational expert opined that such an individual would be unable to perform (Plaintiff's) past relevant work, all of which require public contact. Accordingly, having considered the demands of (Plaintiff's) past relevant work in light of the above-adopted residual functional capacity, the undersigned adopts the vocational expert's persuasive analysis and so finds.

7. (Plaintiff) was born on December 25, 1983 and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. (Plaintiff) has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that (Plaintiff) is "not disabled," whether or not (she) has transferable job skills.

10. Considering (Plaintiff's) age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that (Plaintiff) can perform.

If (Plaintiff) has the residual functioning capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, (Plaintiff's) ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to

which these limitations erode the unskilled light occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with (Plaintiff's) age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the following light, unskilled occupations: a small products assembler (DOT 706.684-022); a garment bagger (DOT 920.687-018); and a laundry folder (DOT 369.687-018).

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

11. (Plaintiff) has not been under a disability, as defined in the Social Security Act, from December 15, 2005 through the date of this decision.
(Tr. 12-21) (emphasis in original)(citations to exhibits omitted except where noted).

IV

STANDARD OF REVIEW

A district court may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are not supported by substantial evidence." Sprague v. Bowen, 812 F.2d 1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796 (9th Cir. 1986). The court cannot affirm the Commissioner's final decision simply by isolating a certain amount of supporting evidence. Rather, the court must examine the administrative record as a whole. Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990). Yet, the Commissioner's findings are not subject to reversal because substantial evidence exists in the record to support a different conclusion. See, e.g., Mullen v. Brown, 800 F.2d 535, 545 (6th Cir. 1986). "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." Matthews v. Shalala, 10 F.3d 678, 679 (9th

13

1   Cir. 1993); see Thompson v. Schweiker, 665 F.2d 936, 939 (9th Cir.

2   1982).   The Commissioner's decision must be set aside, even if

3   supported by substantial evidence, if improper legal standards were

4   applied in reaching that decision.   See, e.g., Benitez v. Califano,

5   573 F.2d 653, 655 (9th Cir. 1978).

6                                        V

7        THE ALJ DID NOT IGNORE THE OPINION OF DR. SCIOLLA[1/]

8        Plaintiff argues that the ALJ erred in ignoring Plaintiff's

9   treating psychiatrist, Dr. Sciolla's opinion. Defendant contends that

10  the ALJ did not ignore Dr. Sciolla's opinion.

11       The Court's review of the administrative record indicates

12  that Plaintiff has misconstrued the record. While the ALJ did not

13  mention Dr. Sciolla by name, the ALJ referenced and thoroughly

14  discussed Dr. Sciolla's records. Dr. Sciolla's records are identified

15  in the record as Exhibit 19F. (Tr. 467-494).   The ALJ's decision

16  noted that Dr. Sciolla's records provided the following information:

17       1. Plaintiff graduated high school with a "C" average,

18  despite her attention problems. (Tr. 15).

19       2. Plaintiff's depression worsened in December 2006,

20  apparently exacerbated by the death of her best friend in December

21  2006 due to a gun shot wound, which followed shortly after the death

22  of her sister in June 2006 due to illness.

23       3. Plaintiff presented for treatment in mid 2007 and had a

24  positive response to prescribed treatment, including psychiatric

25  medications and counseling.   In July 2007, Plaintiff had an anxious

26  mood, but normal orientation, clear and directed speech, normal

27

28  _____
    [1/]   Plaintiff and Defendant refer to "Dr. Sciolia." However, the record
          reflects that the correct spelling of the doctor's last name is
          "Sciolla."

                                  14

1 mental abilities, good attention, linear thought process and good

2 insight. (Tr. 15).

3        4. Plaintiff admitted to a history of marijuana and alcohol

4 abuse. (Tr. 15).

5        5. Plaintiff was diagnosed with major depressive disorder,

6 post-traumatic stress disorder, personality disorder, and alcohol and

7 marijuana dependence in full, sustained remission. (Tr. 15).

8        6. Plaintiff's reported mental status symptoms were usually

9 related to non-compliance with prescribed treatment.  For example,

10 in October 2007, her mood was only so-so and her affect was con-

11 stricted, but she had been only partially compliant with her

12 prescribed medication.  In May 2008, Plaintiff's mood was awful and

13 her affect was restricted, but she stopped taking her prescribed

14 anti-depressant Effexor.  By contrast, when Plaintiff was compliant

15 with her prescribed medication, she had normal mental status

16 examinations in August 2007, January, March, April, June, and August

17 2008. (Tr. 15-16).

18        7. Plaintiff's psychological symptoms appear to be adequately

19 controlled with prescribed treatment. (Tr. 19).

20        8. During Dr. Sciolla's examinations, Plaintiff did not

21 display memory loss or concentration deficits. (Tr. 18).

22        Further, Dr. Sciolla did not offer an opinion that was

23 inconsistent with the ALJ's finding of non-disability. (Tr. 17, 467-

24 494). In fact, the ALJ noted that neither Dr. Sciolla, nor any

25 treating physician, imposed any specific mental functioning limita-

26 tions that were contrary to his finding of Plaintiff's residual

27 functioning capacity. (Tr. 19).

28

09cv1380

1    It is clear from review of the administrative record that the
2    ALJ did not ignore Dr. Sciolla's records or opinion. In fact, the
3    contrary is true. As a result, the Court RECOMMENDS that Plaintiff's
4    Motion for Summary Judgment in this regard be DENIED and that
5    Defendant's Motion for Summary Judgment in this regard be GRANTED.

6                                       V

7    **THE ALJ ERRED IN RELYING ON THE VOCATIONAL EXPERT'S TESTIMONY**
     **BUT THE ERRORS WERE HARMLESS**
8    Plaintiff argues that the ALJ failed to pose a hypothetical
9    question to the vocational expert that contained all of Plaintiff's
10   limitations. Defendant contends that the hypothetical question posed
11   by the ALJ was proper.

12   If a claimant shows that she can not return to her previous
13   job, the burden of proof shifts to the defendant to show that the
14   claimant can do other kinds of work. If there is no reliable evidence
15   of a claimant's ability to perform specific jobs, Defendant and/or
16   the ALJ must use a vocational expert to provide the evidence.
17   Hypothetical questions posed to the vocational expert must set out
18   all the limitations and restrictions of the claimant. Embrey v.
19   Bowen, 849 F.2d 418, 422 (9th Cir. 1988). The ALJ's depiction of the
20   claimant's disability must be accurate, detailed and supported by the
21   medical record. The vocational expert then responds to hypothetical
22   factual scenarios and opines, by testifying on the record, to what
23   jobs the claimant can still perform and whether there is a sufficient
24   number of those jobs available in the claimant's region or in other
25   regions of the economy to support a finding of "not disabled."
26   Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).

27   Harmless error applies in the Social Security context. If
28   the ALJ commits an error that is inconsequential to the ultimate

09cv1380

determination of non-disability, the error is harmless.  The error
is harmless if the court can confidently conclude that no reasonable
ALJ could have reached a different disability determination. Stout
v. Commissioner, 454 F.3d 1050, 1055-1056 (9th Cir. 2006).

    1. Vocational Expert Testimony

    The ALJ and Plaintiff's attorney asked the vocational expert
hypothetical questions regarding what jobs a person with Plaintiff's
limitations could perform. (Tr. 61-65).

    Social Security Ruling 00-4p (hereafter "SSR 00-4p") states
in pertinent part that "(w)hen a (vocational expert)... provides
evidence about the requirements of a job or occupation, the adjudica-
tor has an affirmative responsibility to ask about any possible
conflict between that (vocational expert)... evidence and information
provided in the Dictionary of Occupational Titles (hereafter
'DOT')."(emphasis added)

    SSR 00-4p further provides that the adjudicator "will ask"
the vocational expert "if the evidence he or she has provided is
consistent with the (DOT) and obtain a reasonable explanation for any
apparent conflict."  SSR 00-4p at *4 (emphasis added); Massachi v.
Astrue, 486 F.3d 1149 (9th Cir. 2007).

    An ALJ may rely on expert testimony which contradicts the
DOT, but only insofar as the record contains persuasive evidence to
support the deviation. Johnson, 60 F.3d at 1435.

> The procedural requirements of SSR 00-4p ensure that
> the record is clear as to why an ALJ relied on a
> vocational expert's testimony, particularly in cases
> where the expert's testimony conflicts with the
> (DOT)... (T)he Social Security Administration relies
> primarily on the (DOT) for 'information about the
> requirements of work in the national economy.' The
> Social Security Administration also uses testimony
> from vocational experts to obtain occupational
> evidence. Although evidence provided by a vocational

09cv1380

> expert 'generally should be consistent' with the
> (DOT), neither the (DOT) nor the (vocational ex-
> pert)... evidence automatically 'trumps when there is
> a conflict.' Thus, the ALJ must first determine
> whether a conflict exists.  If it does, the ALJ must
> then determine whether the vocational expert's
> explanation for the conflict is reasonable and
> whether a basis exists for relying on the expert
> rather that the (DOT).

Massachi, 406 F.3d at 1453 (citations omitted).

Here, the ALJ found that Plaintiff had the residual func-
tional capacity to perform light work, except that she may not work
on uneven terrain, at unprotected heights or near dangerous moving
machinery, may not drive industrial machinery, is precluded from
frequent squatting or crawling and is limited to unskilled low stress
work involving limited public contact. (Tr. 17). Further, Dr.
Weilepp, who the ALJ found persuasive, opined that Plaintiff is
capable of lifting twenty pounds frequently, forty pounds occasion-
ally and should not engage in frequent kneeling. (Tr. 13).

The ALJ asked the vocational expert the following question:

> If I find... that the Claimant is limited to light
> work with the qualifications are added restrictions
> that she should not work on uneven terrain or drive
> dangerous machinery, work near – I'd say drive
> industrial machinery or work near or close to danger-
> ous moving machinery.  If I find that she would have
> limited capacity for dealing with the public, her
> work should be loss[2] stress, limited public contact,
> and no continual occasional restrictions – I'm sorry,
> occasional postural restrictions would be indicated
> rather than continuous and no frequent squatting and
> crawling, and no working at unprotected heights. With
> those restrictions, would she be able to do any of
> her past work?

(Tr. 61-62).[3]

---

[2] The transcript contains the word "loss."  However, a fair reading of
the transcript would indicate that the word should be "low."

[3] The Court notes that the hypothetical question did not include
Plaintiff's ability to lift twenty pounds frequently, forty pounds
occasionally and the limitation that she should not engage in
frequent kneeling.

09cv1380

The vocational expert responded that she could not perform her past work. (Tr. 62). Then, the ALJ asked the vocational expert what other work a claimant with the above-noted restrictions, could perform. The vocational expert responded that a person with the restrictions noted in the ALJ's hypothetical question could perform the work of a Small Products Assembler (DOT 706.684-022); a Garment Bagger (DOT 920.687-018); and a Laundry Folder (DOT 369.687-018). (Tr. 62). The ALJ did not ask the vocational expert if his testimony comported with, or conflicted with, the DOT.

The Court's review of the DOT for the jobs noted above shows that Plaintiff, with her limitations, can perform these jobs. None of these jobs require working on uneven terrain or at unprotected heights, on or near dangerous machinery, nor frequent squatting or kneeling. Further, these jobs do not require lifting more than twenty pounds occasionally, which is well within Plaintiff's capabilities, and are unskilled, low stress work involving limited public contact.

2. <u>Harmless Error</u>

The Court has already noted that the ALJ's hypothetical question to the vocational expert failed to include several of Plaintiff's abilities and limitations. Since the hypothetical question posed to the vocational expert did not set out all of Plaintiff's abilities and limitations, the hypothetical question violated the dictates of <u>Embrey</u>, 849 F.2d at 422. Therefore, the Court concludes that the ALJ erred in posing the hypothetical question to the vocational expert. Further, the ALJ erred in failing to ask the vocational expert, pursuant to SSR 00-4p, if the evidence he provided conflicted with, or was consistent with, the DOT.

09cv1380

1    However, the Court finds that these errors were harmless
2  because they were inconsequential to the ALJ's determination of
3  Plaintiff's non-disability.  As indicated above, the DOT's descrip-
4  tions of a Small Products Assembler, a Garment Bagger and a Laundry
5  Folder are essentially consistent with the ALJ's hypothetical
6  question to the vocational expert, and consistent with the added
7  limitations noted by Dr. Weilepp.  Therefore, the Court confidently
8  concludes that no reasonable ALJ could have reached a different
9  disability determination, or could have concluded that Plaintiff
10 could not perform the above-noted jobs.  As a result, the Court
11 RECOMMENDS that Plaintiff's Motion for Summary Judgment in this
12 regard be DENIED and Defendant's Motion for Summary Judgment in this
13 regard be GRANTED.

14                              VI

15              CONCLUSION AND RECOMMENDATION

16    After a review of the record in this matter, the undersigned
17 Magistrate Judge RECOMMENDS that Plaintiff's Motion for Summary
18 Judgment be DENIED and Defendant's Motion for Summary Judgment be
19 GRANTED.

20    This report and recommendation of the undersigned Magistrate
21 Judge is submitted to the United States District Judge assigned to
22 this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

23    **IT IS ORDERED** that no later than September 3, 2010, any party
24 to this action may file written objections with the Court and serve
25 a copy on all parties.  The document should be captioned "Objections
26 to Report and Recommendation."

27    **IT IS FURTHER ORDERED** that any reply to the objections shall
28 be filed with the Court and served on all parties no later than

09cv1380

1   September 13, 2010. The parties are advised that failure to file

2   objections within the specified time may waive the right to raise

3   those objections on appeal of the Court's order.  Martinez v. Ylst,

4   951 F.2d 1153 (9th Cir. 1991).

DATED:  August 13, 2010

_____

Hon. William V. Gallo
U.S. Magistrate Judge

21

09cv1380